UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:15-cr-464- RLW-NCC |
| | ) | Judge Ronnie L. White |
| YEV GRAY, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT YEV GRAY'S SENTENCING MEMORANDUM**

Defendant, **YEV GRAY,** by and through his attorneys, **THOMAS ANTHONY DURKIN** and **ROBIN V. WATERS**, pursuant to Rule 32(c) of the Federal Rules of Criminal Procedure, the opinions of the United States Supreme Court in *United States v. Booker,* 543 U.S. 220 (2005), *Rita v. United States,* 551 U.S. 338 (2007), *Gall v. United States,* 552 U.S. 38 (2007), *Kimbrough v. United States,* 552 U.S. 85 (2007), and *Nelson v. United States,* 555 U.S. 350 (2009), as well as 18 U.S.C. § 3553(a), and the written Plea Agreement governed by F.R.Cr.P. 11(c)(1)(C), respectfully submits Defendant Yev Gray's Sentencing Memorandum.

On May 12, 2017, Dr. Yev Gray pleaded guilty to violations of 18 U.S.C. § 371 (Conspiracy to Commit Healthcare Fraud), and 18 U.S.C. § 1035(a)(1) (False Statements Relating to Healthcare Matters). Pursuant to the Plea Agreement, which is governed in part by F.R.Cr.P. 11(c)(1)(C), the parties have agreed that the appropriate disposition of this case is a sentence of ninety (90) months' imprisonment (7.5 years), as well as restitution equal to the amount of the loss resulting from the crimes—$6,974,895.00. (Plea Agreement, p. 2, ¶ 2).  The Court has deferred acceptance of Defendant's 11(c)(1)(C) plea agreement pending the outcome of the Presentence Investigation.

A district court may accept or reject an 11(c)(1)(C) plea agreement "based on its determination that the agreement was not involuntary or unfair." *United States v. Scurlark*, 560 F.3d 839, 842 (8th Cir. 2009) (internal quotations omitted). *See also*, *United States v. Kling*, 516 F.3d 702, 704 (8th Cir. 2008). In deciding whether to accept an 11(c)(1)(C) plea agreement, the district court should bear in mind the public interest, and must consider the characteristics of the Defendant and the factors set forth in 18 U.S.C. § 3553(a). *See generally*, *United States v. Orthofix, Inc.*, 956 F.Supp. 2d 316 (D. Mass. 2013)(analyzing the application of 11(c)(1)(C) plea agreements to corporate defendants). For all the reasons set forth below, counsel submit that the ninety (90) month sentence and agreed restitution award is a disposition that is sufficient but not greater than necessary to effectuate each of the goals of federal sentencing delineated at 18 U.S.C. § 3553(a).

The Presentence Investigation Report ('PSR") prepared by Probation was filed on July 11, 2017. Counsel have no objections to the PSR, save for a few amendments and clarifications that were submitted to the Probation Officer. (*See* Defendant's Statement Regarding the Presentence Investigation, Dkt. #246). The PSR and Plea Agreement both contain the same calculation of the Sentencing Guidelines: Total Offense Level of 30, and Criminal History Category I, resulting in an Advisory Guideline Range of 97 – 121 months' imprisonment (8 – 10 years). (*See* Plea Agreement, p. 28; PSR, p. 16). As such, and in light of the agreed sentence, counsel will not belabor the guidelines calculation here.

However, as this Court is no doubt well aware, since *United States v. Booker*, 543 U.S. 220, 264 (2005) the applicable Guideline range has been advice this Court should consider but is not required to follow. And, even as advice, the Guidelines themselves can be flawed, as the United States Supreme Court suggested in *Nelson v. United States*, 555 U.S. 350, 351 (2009), "[t]he Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed

reasonable." Nevertheless, the Guidelines remain a "starting point" and "initial benchmark" for this Court to consider in the determination of a just and appropriate sentence. *See Gall v. United States*, 552 U.S. 38, 49-51 (2007). Likewise, in *Gall* the Supreme Court directed the sentencing judge to "consider all of the 3553(a) factors" to arrive at a just sentence that is "sufficient but not greater than necessary" to achieve the purposes of sentencing. 18 U.S.C. § 3553(a).

18 U.S.C. § 3553(a)(1) first instructs the sentencing court to consider the "nature and circumstances" of the offense. Certainly at this juncture, the Court is well aware of the nature of this healthcare fraud offense—considering the pretrial litigation in this matter, the guilty plea and sentencing hearing that has already taken place for Defendant's wife, Natalie Gray, and the guilty plea of co-defendant James Sayadzad.  In short, and as more fully set forth in all three plea agreements, Dr. Gray, a doctor of podiatric medicine, was the majority owner of Aggeus, a podiatry services company. Defendant Gray was instrumental in creating and implementing an electronic medical record keeping system ("EMR") which at times generated patient progress notes and other documents that did not accurately reflect the true conditions and diagnoses of patients. (Plea Agreement, p. 12, ¶ 35).  Despite Dr. Gray and his co-defendants' knowledge of complaints by Aggeus contracted podiatrists and facilities, Dr. Gray and his co-defendants continued to operate Aggeus and submit claims to Medicare that contained materially false statements with respect to the Medicare program. *Id*. p. 13-22. This resulted in an agreed loss to the Medicare program of $6,974,895.00.[1] *Id*. at 2.

Nothing could excuse the considerable wrongfulness of this scheme, or the harm that it caused to the administration of the Medicare program.  Dr. Gray is remorseful for his actions, and

---

[1] It should be noted, however, that the agreed loss in co-defendant James Sayadzad's plea agreement—for whatever reason—is only between $1.5 million and $3.5 million dollars. (*See* Sayadzad Plea Agreement, p. 20, ¶ 6(a)(2)). This results in a two-point reduction in Sayadzad's guideline calculation.

the harm it has caused. He accepts full responsibility for his behavior. However, additional context may assist the Court, at the very least, to understand how Dr. Gray came to commit this crime and fall from grace in such spectacular fashion. As the Court will see, this context necessarily involves consideration of Dr. Gray's "history and characteristics," factors the Court is required to consider pursuant to § 3553(a)(1).

A confluence of unexpected and personally crushing events in Dr. Gray's life in 2008 provides context to the commission of the instant offense beginning in 2009. These facts are not meant as an excuse, but rather as an explanation in mitigation. First, Dr. Gray was seriously injured in a car accident in 2008 while driving to a nursing home in Wisconsin. (PSR, p. 18, ¶ 71). The effects of this injury were manifold and career changing. The accident caused serious damage to his left eye and resulted in irreversible impaired vision—preventing Dr. Gray from being able to perform podiatric surgery, the specialty at which he had excelled. *Id*. The considerable pride and professional fulfillment he derived from his podiatric practice was taken away in an instant and caused Dr. Gray—a lifelong sufferer of depression—to succumb to feelings of withdrawal and dejection. Worse, and compounding his downward spiral considerably, the accident and concomitant depression fed into Dr. Gray's serious and escalating alcoholism. Unable to continue performing surgery and treating patients, Dr. Gray turned to other aspects of his podiatric practice that had expanded into a multi-state business operation. But for this accident, it is likely that Dr. Gray could have remained a successful surgeon instead of a businessman.

Moreover, though Dr. Gray accepts full responsibility for his behavior in this case, and acknowledges the wrongfulness of his conduct, his overall state of mind and the attention he paid to his company during the offense conduct was considerably clouded by his depression, alcoholism and withdrawal from his inability to practice podiatry—which had always imbued him with a sense

4

of purpose. Further, the breakdown of Dr. Gray's relationship with his father also in 2008, and the death of his mother 2005, only further contributed to his despair.

As is set forth in the PSR, however, Dr. Gray has taken considerable steps since his charging in this case, for the first time, to finally address his depression, alcoholism, and deeply rooted issues that could be said to stem in part from his harsh upbringing in Ukraine by his verbally abusive father.

Since 2015, Dr. Gray has consistently met with Dr. Garey Malek, a psychiatrist in Chicago who has provided not only individualized therapy, but also marital counseling for Dr. Gray and his wife and co-defendant Natalie Gray. Dr. Malek has diagnosed Dr. Gray with Major Depressive Disorder and Alcohol Abuse. However, a combination of therapy and medication, as set forth in the PSR, have improved Dr. Gray's mental and emotional state—although his battle with depression and alcoholism is a daily struggle and one that will continue to require close attention and treatment during his incarceration. In this vein, Dr. Gray has also sought to address his deeper mental and emotional issues by seeking spiritual guidance in keeping with his Jewish faith. Dr. Gray has been meeting with a rabbi of the Chabad-Lubavitch sect of the Hassidic Jewish faith in the months preceding his sentencing, and intends to continue that practice during his incarceration. A letter from Dr. Gray's rabbi will be submitted to the Court under separate cover. These post-rehabilitative efforts can certainly be taken into account by the Court when determining a sentence that is sufficient but not greater than necessary to carry out the sentencing goals. Moreover, Dr. Gray's efforts to better himself and understand his behavior lend further support to his sincere acceptance of responsibility for his actions, and the reasonableness of the imposition of the agreed ninety (90) month sentence.

Moreover, as noted above and set forth in detail in the PSR, Dr. Gray did not have an easy upbringing, and his sensational rise in stature from a middle-class Ukrainian immigrant to owner of a large healthcare company spanning sixteen U.S. states at its height is nothing short of astounding—another significant factor that can be considered under 18 U.SC. § 3553(a)(1). Born in Kharkov, Ukraine in 1967, in what was then the Soviet Union, Dr. Gray was raised an only child by his mother and father. (PSR, p. 17, ¶ 66).  Dr. Gray describes his father as "vengeful and short tempered" and his childhood is filled with memories of his father's verbal abuse and ridicule.  Dr. Gray suspects his father is likely a sufferer of Bi-polar disorder or Schizophrenia which could explain, at least in part, some of his erratic behavior.

In 1977, Dr. Gray and his family immigrated to Edmonton, Canada. *Id*. at p. 18, ¶ 69. In 1992, Dr. Gray immigrated by himself to the United States, settling in Chicago, Illinois where he has since remained. *Id*. Dr. Gray obtained a Bachelor of Science in Electrical Engineering and in Biological Sciences, and earned his Doctor of Podiatric Medicine degree in 1996 from the Dr. William M. School College of Podiatric Medicine. *Id*. at p. 20, ¶ 79-80.

Also in 1996, Dr. Gray married his wife, and co-defendant, Natalie Gray. As is noted in the PSR, his relationship with Natalie Gray has, at times, been rocky due to Dr. Gray's depression, alcoholism, emotional issues, and the stresses and pressures of being indicted together in a federal criminal case. However, both have made efforts to participate in martial counseling and remain supportive of each other through this very difficult process. Dr. Gray and his wife also have a twelve-year-old son, Evan, for whom Dr. Gray has been caring while his wife serves her sentence of imprisonment imposed by the Court. In fact, the Plea Agreement specifically provides that Dr. Gray be permitted to surrender to serve the incarceration portion of his sentence after Natalie is released so that their son may have a parent caregiver at all times. (Plea Agreement, p. 30, ¶ 8(e)).

Natalie Gray surrendered to her Bureau of Prisons designated institution on June 8, 2017, and has an anticipated release date of April 21, 2018.

Dr. Gray's upbringing and family circumstances provide additional context and mitigation for the Court to rely upon in accepting the 11(c)(1)(C) Plea Agreement and imposing the agreed sentence of ninety (90) months.  Excluding the instant offense, and by way of further mitigation, Dr. Gray also has no criminal history. As such, his impressive background and education is certainly a mitigating factor.

After considering the nature and circumstances of the offense and the history and characteristics of the defendant, the Court is charged with fashioning a sentence that is sufficient, but not greater than necessary—taking into account the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence, protect the public from further crimes of the defendant, and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2)(A)-(D). In light of each of the factors, counsel submit that a sentence of ninety (90) months, and restitution in the amount of $6,974,895.00 is quite sufficient but not greater than necessary to accomplish the sentencing goals.

In terms of the specific deterrence sentencing goal, Dr. Gray will be prohibited from participation in the Medicare program as a result of his conviction.  More, as is noted in the PSR (p. 20, ¶ 81) many of the states in which Dr. Gray possessed a medical license have taken disciplinary action against his license. In addition to the physical impairment from the automobile accident, this conviction all but ensures that he will not pose a risk to the administration of the Medicare program in the future. Beyond the specific deterrence sentencing rationale, a ninety (90) month sentence and a nearly $7 million dollar restitution award sends a very strong message to

others who might see fit to engage in similar behavior. No one could consider that sentence a lenient one by any stretch of the imagination.

18 U.S.C. § 3553(a)(7) further instructs sentencing courts to consider "the need to provide restitution to any victims of the offense," when imposing a sentence. As this Court is aware from the parallel civil proceeding which resulted in the pretrial restraint of Dr. Gray and his co-defendants' assets, the Government has access to a significant amount of Defendant's assets including bank accounts and real property. At the time it moved for the pretrial restraint of these assets, the government estimated the value of these assets at $5 million dollars. (*See* United States' Emergency *Ex Parte* Motion for Temporary Restraining Order and Preliminary Injunctions and Supporting Memorandum of Law, Dkt. #3, p. 11). These assets will now be used to pay Defendant's restitution obligations. As such, the Court's acceptance of the agreed sentence and restitution award would further this important sentencing goal. The forfeiture of assets of this magnitude is also significant punishment unto itself.

For all of these reasons, counsel submit that the ninety (90) months sentence is sufficient but not greater than necessary to carry out the sentencing goals, and ask that the Court find that the agreed sentence is fair to impose.

    Respectfully submitted,

/s/ Thomas Anthony Durkin
**THOMAS ANTHONY DURKIN,**

/s/Robin V. Waters
**ROBIN V. WATERS,**
Attorneys for Defendant Yev Gray.

**DURKIN & ROBERTS**
2446 N. Clark Street
Chicago, IL 60614
(312) 913-9300
tdurkin@durkinroberts.com
rwaters@durkinroberts.com

8

## **CERTIFICATE OF SERVICE**

      Thomas Anthony Durkin, Attorney at Law, hereby certifies that the foregoing Defendant Yev Gray's Sentencing Memorandum, was served on August 8 2017, in accordance with Fed.R.Crim.P.49, Fed.R.Civ.P.5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

      /s/ Thomas Anthony Durkin
**THOMAS ANTHONY DURKIN**
2446 N. Clark St.
Chicago, IL 60614
(312) 913-9300
tdurkin@durkinroberts.com